UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**EDGAR LEWIS KEENE,**

    **Plaintiff,**

v.                                                                                                    Case No:  8:13-cv-607-T-DNF

**COMMISSIONER OF SOCIAL SECURITY[1],**

    **Defendant.**

## OPINION AND ORDER

This cause is before the Court on Plaintiff's Complaint (Doc. 1) filed on March 6, 2013. Plaintiff, Edgar Lewis Keene, seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying his claim for Social Security Disability Insurance Benefits and Supplemental Security Income disability benefits.  The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, the decision of the Commissioner is **AFFIRMED** pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. Fed. R. Civ. P. 25(d).  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. Social Security Act Eligibility, the ALJ Decision, and Standard of Review

### A. Eligibility

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1)(A), 1382(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382(a)(3); 20 C.F.R. §§ 404.1505 - 404.1511, 416.905 - 416.911. Plaintiff bears the burden of persuasion through step four, while at step five the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987).

### B. Procedural History

On January 6, 2010, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. Plaintiff also filed a Title XVI application for supplemental security income on June 2, 2010. In both applications, Plaintiff asserted a disability onset date of April 30, 2008. On September 14, 2010, the Commissioner denied the applications initially, and denied the application upon reconsideration on January 12, 2011. A hearing was held before Administrative Law Judge David J. Begley (the "ALJ") on January 5, 2012. The ALJ issued an unfavorable decision on February 24, 2012. Plaintiff filed the instant action in federal court on March 6, 2013.

### C. Summary of the ALJ's Decision

The ALJ found Plaintiff met the Social Security Act's insured status requirements through September 30, 2013. (Tr. p. 25). At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 30, 2008. (Tr. p. 25).

At step two, the ALJ found that Plaintiff suffered from the severe impairments of "bipolar disorder, major depressive disorder, generalized osteoarthritis, and migraine headaches" (20 CFR 4041520(c) and 416.920(c)).  The impairments are categorized as "severe" only insofar as they cause more than minimal functional limitations in the claimant's ability to perform some basic work activities." (Tr. p. 25).

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  (Tr. p. 25).  The ALJ found Plaintiff's "impairments, while severe, do not satisfy the requisite neurological, laboratory, clinical and/or diagnostic requirements for listing level severity" and that "there are no medical findings that precisely meet or medically equal the criteria of any impairment described in the Listing of Impairments."  (Tr. p. 26).

At step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to "perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to simple routine and repetitive tasks; he requires a low stress job with no production quotas or exposure to hazardous conditions; he should have only occasional decision making and changes to work setting; he can be around co-workers, but with only occasional interaction; and he should have only occasional interaction with the general public."  (Tr. p. 27).

At step five, the ALJ determined that Plaintiff was not disabled, but is unable to perform any past relevant work.  (Tr. p. 32). The ALJ observed that Plaintiff was a younger individual on the alleged onset date, had at least a high school education, and can communicate in English.  The ALJ also found that the transferability of job skill was not material and jobs exist in significant numbers in the national economy that Plaintiff can perform such as sorter (DOT #753.587-010,

SVP 2, unskilled, sedentary exertional level) and hand packager (DOT #559.687-074, SVP 2, sedentary exertional level).

### D. Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standard, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales,* 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II. Review of Facts and Conclusions of Law

### A. Background Facts

Plaintiff was born on November 12, 1962, and was 49 years old on the date of the hearing. (Tr. p. 48). He obtained his GED while in prison and has no vocational skills or special training. (Tr. p. 51, 52). He lives with a longtime friend in a single story home. (Tr. p. 51). Plaintiff's last full time employment ended in January of 2007 after Plaintiff witnessed the death of a person he considered a father figure while on the job as a labor foreman for a refractory crew at the mines. (Tr. p. 49). Plaintiff asserted that he tried to work at a different company but, after three weeks, "couldn't handle it." (Tr. p. 49). Plaintiff states that the emotional trauma from witnessing his friend's death prevents him from working and causes him to have a low mood a couple of times a week. (Tr. p. 50, 65). However, when questioned about whether his friend's death causes him to be unable to get out of bed in the morning or be around people, Plaintiff attributed difficulty and low mood to upsetting comments from his wife. (Tr. p. 65).

Plaintiff sought employment at a fast food establishment, but believes he was not hired due to his criminal history. (Tr. p. 50). Plaintiff sought to pull weeds, but stated that the physical exertion caused pain in his arms and shoulders for three days afterward. (Tr. p. 50). Plaintiff currently earns income by "taking out the trash" and scraping metal. (Tr. p. 52, 57).

As to his physical abilities, Plaintiff stated that, if he could change positions, he could stand for twenty-five to thirty minutes (Tr. p. 56), sit for one hour, and lift ten to twenty pounds (Tr. p. 57). Plaintiff stated that he has occasional hand cramps. (Tr. p. 57). Plaintiff stated he does not do his own grocery shopping because he is "not good at it" but instead prefers grocery store sub sandwiches or fast food. (Tr. p. 58). Plaintiff is able to bath himself, play with his grandson (including walking in the yard with him), do laundry, and clean dishes. (Tr. p. 57, 58). Plaintiff

testified that the pain in his shoulders and elbows disrupts his sleep, but that he does get six to seven hours of sleep each night. (Tr. p. 59). Plaintiff also testified that he attends hour-long church services approximately once a month where congregants "do a lot of standing and sitting down." (Tr. p. 66). Plaintiff claims to have a driver's license and drives himself short distances (Tr. p. 51) including driving himself around to scrap metal and earn income three times a week for three to four hours at a time (Tr. p. 64, 65).

Plaintiff is being treated by Dr. Renner for arthritis (Tr. p. 52) and Peace River for his mental health (Tr. p. 53). At the time of the hearing, Plaintiff was taking six prescription drugs including Prilosec, Celexa, Fioricet, Diazepam, Flexeril, Tramadol and testified to taking all his prescribed medications regularly. (Tr. p 53, 54). Plaintiff reported the prescription drugs made him constipated, occasionally jittery, and sleepy. (Tr. p. 54). Plaintiff testified that Dr. Renner's treatment was helping his arthritis. (Tr. p. 56). Plaintiff also testified that when he takes his medication, his migraines are "all right." (Tr. p. 60).

### B. Vocational Expert

A Vocational Expert, Dr. David Burnhill, testified at the hearing before the ALJ on January 5, 2012. Dr. Burnhill testified that Plaintiff's past relevant work was as a refractory worker which is a DOT code 861.687-010, SVP:4, skilled worker, and heavy work. (Tr. p. 68, 69).

The ALJ presented the following hypothetical to Dr. Burnhill:

**ALJ:** Let's assume a person of the claimant's age, education and work experience who could do a full range of light work, would be limited to simple routine, repetitive tasks, low stress job having no fixed production quotas, no hazardous conditions, only occasional changes in work setting, occasional decision making. Could be around co-workers, but only occasional interaction. Only intermittent interaction with the general public. Could such a person be able to do any of the claimant's past relevant work?

**VE:** No, Your Honor.

**ALJ:** Would there be jobs available for such a person?

**VE:** Yes, Your Honor. For example, there could be work as a Sorter, performed at the light exertional level. It's SVP 2, unskilled. The DOT code is 753.587-010. There are currently 430,000 jobs in the United States. Florida has 11,000 of those. There could also be work for example, such as a Hand Packager. This is also performed at the light exertional level. It's also SVP 2, unskilled labor. The DOT code is 559.687-074. With the same census group, the Department of Labor, there are 430,000 jobs in the United States and 11,000 in Florida. There can also be work for example, such as a night cleaner. This is also light and also SVP 2. The DOT code is 323.687-014. There are currently 890,000 jobs in the United States. Florida has approximately 58,000 of those.

. . .

**Q:** Okay. Well, then let me give you a hypothetical based on Dr. Renner's RFC. Same age, education, past work, only lift ten pounds maximum, stand and walk for less than two hours during an eight hour work day, for only thirty minutes to one hour at a time. No limits in sitting. Never climb, balance, stoop, crouch, kneel, or crawl.

. . .

**Q:** No reaching or push/pull. Changing positions frequently, sit/stand option. Could that person perform past relevant work?

**A:** No.

**Q:** Other jobs?

**A:** No.

**Q:** Okay. Going back to hypothetical number one, if we added the sit/stand option would that affect the jobs you cited?

. . .

**A:** It would take out the Night Cleaner, but not the Sorter or the Hand Packager. And it would reduce the numbers on the Hand Packager by fifty percent. But there would be others.

**Q:** And if we add to the hypothetical number one, as we had it with the sit/stand option and change interaction with co-workers and general public to less than occasional, would that affect the jobs you cited?

**A:** No. At those jobs, basically you're sitting at a station maybe next to co-workers, so you're really not supposed to be interacting with them. You're supposed to be working. So the answer would be no.

**Q:** And if such an individual were going to miss three to five days a week due to symptoms of mental problems, would that affect the jobs you cited?

**A:** Obviously yes.

**Q:** Is there any other work that would be able to be performed in the national economy?

**A:** No, there would not.

(Tr. p. 25-31).

    **C.**   **Specific Issues**

Plaintiff raises two issues on appeal: (1) whether the reasons given by the ALJ for rejecting the treating physician's opinion in this case was proper; and (2) whether the ALJ's treatment of the mental issues in this case was proper. The Court will address each issue in turn.

    **1. WHETHER THE REASONS GIVEN BY THE ALJ FOR REJECTING THE TREATING PHYSICIAN'S OPINION IN THIS CASE WAS PROPER**

Plaintiff argues that the ALJ erred in his finding that the opinion of Plaintiff's treating physician, Dr. Eric B. Ranon, is not reflected in his own treatment records. (Doc. 18 p. 12). In particular, Plaintiff contends that the ALJ wrongfully discredited Dr. Ranon's RFC opinion on the basis that he did not order any diagnostic imaging. (Doc. 18 p. 13). Plaintiff explains that this failure to order diagnostic imaging is not a statement as to the severity of Plaintiff's impairments, but rather a condition of the underfunded health care program where Plaintiff received treatment. (Doc. 18 p. 13). Additionally, Plaintiff argues that, contrary to the ALJ's finding, there is no inconsistency between Plaintiff's activity level and Dr. Ranon's RFC finding. (Doc. 18 p. 13).

Defendant responds that the ALJ properly gave little weight to the treating physician's

opinion because it was inconsistent with the record as a whole. (Doc. 19 p. 8). Defendant contends that Dr. Ranon's RFC opinion was not consistent with his own conservative treatment of Plaintiff. (Doc. 19 p. 8). Defendant asserts that notes from Plaintiff's seven visits to Dr. Ranon do not show that Plaintiff had disabling limitations or that diagnostic testing was needed. (Doc. 19 p. 8). Finally, Defendant argues that Plaintiff's reported daily activities show that his condition is not as disabling as alleged. (Doc. 19 p. 9).

Social Security Regulations "establish a 'hierarchy' among medical opinions that provides a framework for determining the weight afforded each medical opinion." *Belge v. Astrue*, No. 3:09-cv-529-J-JRK, 2010 WL 3824156, at *3 (M.D. Fla. Sept. 27, 2010). Under this hierarchy, "the opinions of examining physicians are generally given more weight than nonexamining physicians; treating physicians receive more weight that nontreating physicians; and specialists on issues within their areas of expertise receive more weight than nonspecialists." *Id*. (internal citations and quotations omitted). When considering a treating physician's testimony, the ALJ must ordinarily give substantial or considerable weight to such testimony unless "good cause" is shown to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004); *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987) (noting that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d). Such a preference is given to treating sources because they are likely to be best situated to provide a detailed and longitudinal picture of the medical impairments. *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). Furthermore, the ALJ must specify the weight given to the treating physician's opinion or reasons for giving the opinion no weight, and the failure to do so is reversible error. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). "Good cause" for rejecting a treating source's

opinion may be found where the treating source's opinion was not bolstered by the evidence, the evidence supported a contrary finding, or the treating source's opinion was conclusory or inconsistent with his or her own medical record. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).

Here, the record indicates that Plaintiff visited Dr. Ranon seven times between May 6, 2010, and September 22, 2011, at Jaycare Medical Center. (Tr. p. 407). During the May 6, 2010 visit, Dr. Ranon noted Plaintiff's history of bipolar disorder and past medications and generalized joint pain. He also noted that Plaintiff was taking Fioricet for tension headaches. (Tr. p. 407). Dr. Ranon diagnosed Plaintiff with bipolar disorder, unspecified; generalized osteoarthrosis, involving multiple sites; and chest pain, unspecified. (Tr. p. 408). Dr. Ranon noted that Plaintiff was on Valium, Celexa and refilled a prescription for Tramadol. (Tr. p. 408).

Plaintiff visited Dr. Ranon again on July 6, 2010. (Tr. p. 409). Dr. Ranon increased Plaintiff's Celexa and Tramadol and specified that the Tramadol was to be taken 5 times a day. (Tr. p. 410). Plaintiff returned to see Dr. Ranon on September 7, 2010. (Tr. p. 411). He noted that the regimen of Valium and Celexa had kept Plaintiff's bipolar disorder under control. (Tr. p. 411). Dr. Ranon diagnosed Plaintiff with bipolar disorder, unspecified; generalized osteoarthrosis, involving multiple sites; and chronic tension type headaches. (Tr. p. 412). Plaintiff returned to see Dr. Ranon on December 7, 2010. (Tr. p. 474). Dr. Ranon noted that Plaintiff was more anxious on that date, and had been taking more Tramadol for control of his osteoarthritis pain. (Tr. p. 474). Dr. Ranon increased the Valium and Tramadol for Plaintiff. (Tr. p. 474). On March 9, 2011, Plaintiff visited Dr. Ranon complaining of heartburn. (Tr. p. 476). Dr. Ranon's diagnoses on this date included esophageal reflux. (Tr. p. 477). Plaintiff saw Dr. Ranon on June 7, 2011 for medicine refills. Dr. Ranon noted that Plaintiff had no new

complaints. (Tr. p. 478). Plaintiff visited Dr. Ranon on September 22, 2011. (Tr. p. 480). On that date, Plaintiff was sick with a cough and had an abscess on his right inner thigh. (Tr. p. 480).

On December 29, 2011, Dr. Ranon completed a Treating/Examining Source Statement of Physical Capacity on behalf of Plaintiff. (Tr. 548-50). Dr. Ranon opined that Plaintiff can lift and/or carry less than ten pounds and stand and/or walk less than two hours in an eight-hour workday and thirty minutes without interruption. (Tr. 548). Dr. Ranon opined that Plaintiff can never climb, balance, stoop, crouch, kneel, or crawl. (Tr. p. 549). Dr. Ranon found that Plaintiff's impairments limit his ability to reach and push/pull. (Tr. p. 549). Dr. Ranon found that Plaintiff's pain is reasonable given the medical findings in his case. (Tr. p. 550). Dr. Ranon concluded that Plaintiff's impairments and pain would keep him from being able to sustain employment for 8 hours a day, 5 days a week. (Tr. 550).

In his opinion, the ALJ considered Dr. Ranon's opinion and accorded it "little weight", (Tr. p. 30). The ALJ explained

> little weight was given to [Dr. Ranon's] opinion because it does not reflect the treatment record during [Plaintiff's] seven visits. Specifically, [Plaintiff] not only manages his pain with moderate medication regimen of Flexeril and Tramadol, his own testimony indicates that he is more active than credited by his treating physician. In this respect, he plays with his grandson twice a day on a daily basis and is able to lift 20 pounds while collecting junk metal to salvage several times per week.

(Tr. p. 30). Later, the ALJ noted that Plaintiff's "testimony regarding his ability to play with his grandson twice a day while collecting junk scrap for sale, and his ability to drive for several hours each day while doing so, indicates he is not as physically impaired [as] he and Dr. Ranon allege." (Tr. p. 32).

Upon review, the Court finds that the ALJ had good cause for according Dr. Ranon's opinion "little weight." The ALJ properly found that Dr. Ranon's restrictive opinion is unsupported by his treatment notes. These treatment notes reveal that Plaintiff presented to Dr.

Ranon seven times over an 18 month period complaining of a variety of ailments including bipolar disorder, generalized osteoarthritis, chronic tension type headaches, and esophageal reflux. There is nothing in these treatment notes, however, that suggests a disabling condition. Although Plaintiff contends that Dr. Ranon's conservative treatment, including the lack of diagnostic testing, was due to the fact that Dr. Ranon's care was a part of an underfunded program, Defendant correctly notes that Dr. Ranon's treatment notes do not show that Plaintiff even needed any diagnostic testing. (Doc. 19 p. 8).

In addition, the ALJ properly noted that Dr. Ranon's opinion that Plaintiff could perform less than sedentary work was also inconsistent with Plaintiff's reported activities. Plaintiff testified that he picks "a lot of trash" (Tr. p. 49) three times a week (Tr. p. 65) for "three to four hours" at a time (Tr. p. 64). Plaintiff testified that he could lift 20 pounds without hurting himself (Tr. p. 57) and that Dr. Ranon's care was helping him manage his pain (Tr. p. 56). The ALJ noted that Plaintiff played with his grandson twice a day on a daily basis. (Tr. p. 30). Plaintiff's mother's third party Function Report indicated that Plaintiff can drive, pick up scrap metal, do basic chores, and provide self-care. (Tr. p. 224). Plaintiff's mother also reported that she and Plaintiff eat out and go fishing. (Tr. p. 224).

The ALJ was under no duty to accept Dr. Ranon's finding that Plaintiff was unable to work since findings such as these are not medical opinions and are reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1)-(3) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled. … We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraph[] (d)(1)…."). Good cause existed for the ALJ to give "less weight" to Dr. Ranon's opinion. The ALJ clearly articulated his reasons and, thus, the

Court will not disturb his finding on review.

## 2. WHETHER THE ALJ'S TREATMENT OF PLAINTIFF'S MENTAL ISSUES WAS PROPER

Plaintiff argues that the ALJ's treatment of Plaintiff's mental issues was erroneous in several ways. (Doc. 18 p. 15). First, Plaintiff contends that the ALJ's finding that Plaintiff's mental health impairments were exacerbated by his failure to comply with the treatment regimen was not supported by substantial evidence. (Doc. 18 p. 15). Second, Plaintiff argues that the ALJ accorded too much weight to Dr. Henley and Dr. Carreo's opinion that Plaintiff "grossly exaggerated his symptoms in order to cast himself as severely mentally ill." (Doc. 18 p. 15). Third, Plaintiff argues that the ALJ erred by relying on the opinions of Drs. Henley and Carreo because these administered a malingering test which is against Social Security policy. (Doc. 18 p. 16). The Commissioner responds that these arguments are without merit and that substantial evidence supports the ALJ's findings as to all three issues raised by Plaintiff.

In his opinion, the ALJ reviewed Plaintiff's record relating to his mental health issues. The ALJ noted that Plaintiff's ailments are "generally characterized between mental health impairments from depression and bipolar disorder, as well as cannabis and methamphetamine dependence, and physical impairments from generalized osteoarthritis and migraine headaches." (Tr. p. 28). The ALJ noted that Plaintiff's mental health treatment records show that he was prescribed psychotropic medications, most recently Celexa. (Tr. p. 29). The ALJ noted that Plaintiff's interaction with the Peace River Center typically involves short episodes of admission for suicidal or homicidal ideations because he stops taking his psychotropic medications. (Tr. p. 29). The ALJ noted that Plaintiff's records show he made an initial admission to Peace River in late May and early June of 2009 for suicidal and homicidal ideaion. Plaintiff was provided

counseling and psychotropic medication and on discharge was stable with a Global Assessment of Functioning (GAF) score of 60-70. (Tr. p. 29).

The ALJ acknowledged that Plaintiff was admitted for three days in mid-July 2010 because he had not taken his medication for a week and was experiencing a particularly stressful time with his family. (Tr. p. 29). The notes from this visit indicate that Plaintiff's GAF was 45 and that he reported daily marijuana use, two joints in the morning immediately prior to his admission, and remote amphetamine use in his history. (Tr. p. 29). Plaintiff was given Celexa and discharged with a GAF score of 70. (Tr. p. 29). The ALJ noted that Plaintiff was admitted again several weeks later in August 2010 after missing his medication. (Tr. p. 29). Plaintiff explained that he could not take his medication because it was stolen from his truck. (Tr. p. 29). Plaintiff's GAF score was 35 upon admission, but was 60 when discharged. (Tr. p. 29). The ALJ commented that "[a]fter each discharge, [Plaintiff] was tasked by clinic staff with following a mental health treatment plan that included psychotropic medication as well as regular therapy." (Tr. p. 29).

Additionally, the ALJ discussed the opinions of state agency evaluators and stated the weight he accorded their opinions. The ALJ noted that Plaintiff was examined by Steven Abraham, Psy.D., a consultative examiner in January 2009. (Tr. p. 30, 293-96). Plaintiff reported depression starting in January 2007 when he witnessed the death of a friend, and intensified in August 2008 when his wife divorced him and he could not find employment due to his criminal record. (Tr. p. 293). Plaintiff reported being able to bathe, dress himself, and attend to his personal hygiene, he was capable of performing simple household tasks, such as picking up after himself and cleaning, and he prepares his meals by microwave. (Tr. p. 294). Plaintiff also reported drug abuse and dependence from age nine to thirty-five (he was forty-six at the time of

the examination) and he was currently smoking cannabis twice a week. (Tr. p. 294). Dr. Abraham diagnosed Plaintiff with Major Depressive Disorder, recurrent, and Severe with Psychotic Features Cannabis Dependence, current. (Tr. p. 295). Dr. Abraham rated Plaintiff's GAF score as 55, indicating only moderate symptoms or moderate difficulty in social, occupational, or school functioning. (Tr. p. 295). Dr. Abraham recommended Plaintiff seek a drug free lifestyle by attending treatment and attending meetings, attend a psychiatric evaluation to determine appropriate medication, seek counseling for mental health issues, and seek vocational training. (Tr. p. 296). The ALJ gave great weight to Dr. Abraham's examination as it was consistent with the record. (Tr. p. 30).

The ALJ noted the opinion of Thomas Conger, Ph.D., a state agency psychological consultant. In February 2009, Dr. Conger reviewed the evidence and opined Plaintiff had the ability to relate effectively and he was capable of performing routine tasks on a sustained basis, if motivated, and he had adequate understanding and adaptation abilities. (Tr. p. 299). The ALJ gave Dr. Conger's opinion great weight as it was consistent with Plaintiff's treatment history, particularly in 2009 and his history of noncompliance with psychiatric medication. (Tr. p. 30).

The ALJ also discussed the August 2010 report of Tracey Henley, Psy.D., and Julie Carreo, Psy.D., consultative examiners. (Tr. p. 31, 353-55). During the examination, Plaintiff reported smoking between two and six marijuana joints daily. (Tr. p. 354). Plaintiff also reported using methamphetamines until two years ago and spending about $150 per week. (Tr. p. 354). Plaintiff reported his typical day as picking through the trash and selling scrap metal and also trying to build a place to stay in the woods. (Tr. p. 355). Plaintiff also denied any difficulties with his personal grooming, completing household chores, and home/financial management skills, such as cooking, shopping, and accessing the community. (Tr. p. 355). As the ALJ noted, on

examination, Drs. Henley and Carreo indicated that Plaintiff demonstrated strong evidence of malingering in several areas during the evaluation. (Tr. p. 355). They diagnosed Plaintiff with malingering, cannabis dependence, and amphetamine dependence (Tr. p. 355). Their report provided the following:

> When [Plaintiff] was asked about his current emotional state, he seemed grossly to exaggerate his symptoms in order to cast himself as severely mentally ill and incapacitated. Due to the numerous and broad complaints expressed by [Plaintiff] that were not consistent with any known psychiatric disorder, a malingering measure was administered. His test results provided strong evidence that he is feigning/exaggerating symptoms of psychosis, emotional dysfunction, neurological impairment, and amnesia.

(Tr. p. 354). The ALJ explained that he gave Drs. Henley and Carreo's opinion great weight because it was consistent with his treatment pattern at Peace River Center. (Tr. p. 31).

Regarding Plaintiff's first argument, the Court finds that the ALJ did not err in considering Plaintiff's failure to comply with his treatment regimen in reaching his decision. The record indicates that Plaintiff reported not taking his medication on multiple occasions, often leading to admissions to the Peace River Center. (Tr. p. 334, 405, 462, 464). Although Plaintiff now argues that his non-compliance was due to the fact that he could not afford medical treatment and medication, the record is devoid of Plaintiff seeking out such mental health counseling or drug therapy. Instead, the record reflects a continual cannabis dependence and antisocial behaviors. Plaintiff's argument that the ALJ should have inquired into the reasons for Plaintiff's non-compliance with prescribed treatment at the hearing is unavailing as well. Plaintiff was represented by counsel at the hearing and was afforded every opportunity to be questioned on his ability to afford his prescribed treatment. For these reasons, the ALJ had substantial evidence to find that Plaintiff's mental health impairments were exacerbated due to his own failure to comply with recommended treatment.

As to Plaintiff's argument that the ALJ erred by giving great weight to Dr. Henley and Dr. Carreo's opinion that Plaintiff exaggerated his symptoms, the Court finds that the ALJ did not err because there was substantial evidence to support this conclusion. Although Plaintiff correctly notes that at no time did anyone from Peace River Center suggest Plaintiff exaggerated his symptoms or was malingering, the opinions of Drs. Henley and Carreo are consistent with treatment notes from Peace River Center that indicate that Plaintiff, while on his medication, has only mild symptoms or some difficulty in social, occupational, or school functioning, and is generally functioning pretty well. (Tr. p. 29, 334). The ALJ did not exclusively rely on the opinion of Drs. Henley and Carreo, but also based his decision on the opinions of Dr. Abraham, Dr. Conger, and Dr. Ames-Dennard, whose opinions he accorded "great weight". The opinions of these doctors was that Plaintiff's mental impairments caused no substantial mental health restrictions. (Tr. p. 299, 429, 437)

As to the malingering test, Plaintiff argues that "the agency should not purchase symptom validity tests as part of a consultative examination" pursuant to POMS DI 22510.0006 and, thus, the opinions of Drs. Henley and Carreo should not have been given any weight. (Doc. 18 p. 16). The Program Operations Manual System (POMS), however, does not have the force of law. *Stroup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003). In the present case, Dr. Henley and Dr. Carreo administered the malingering measure because of "the numerous and broad complaints expressed by [Plaintiff] that were not consistent with any known psychiatric disorder". (Tr. p. 354). The results of the malingering measure provided evidence of feigning or exaggerating symptoms. This evidence was one piece of evidence that resulted in Dr. Henley and Dr. Carreo's ultimate diagnosis and prognosis. It was this ultimate diagnosis and prognosis, which was consistent with Plaintiff's treatment pattern at Peace River Center, that the ALJ gave

great weight. (Tr. p. 31). For this reason, even if Drs. Henley and Carreo broke policy by administering a malingering test, the ALJ did not err by relying on their opinions. The ALJ's finding as to Plaintiff's mental health and the weighing of the expert opinions was not improper because substantial evidence existed in the record to support the ALJ's finding.

### III. Conclusion

The record, taken as a whole, contains substantial evidence to support the ALJ's decision. For the reasons states above,

**IT IS HEREBY ORDERED:**

1. The final decision of the Commissioner is **AFFIRMED**.

2. The Clerk is directed to enter judgment for the Commissioner and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on March 5, 2014.

*[signature]*
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties